UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JERRY CRAWFORD, CHARLES ANNABEL
DARRYL BALLARD, MATTHEW BURDO,
DON HOSKINS, ROY LANNING, PETER
"LARRY" POWELL, WANDA SIMPSON,
and DANIEL SLANE,
            Plaintiffs,

v.                                      Case No. 06-14276
                                         Honorable Patrick J. Duggan

TRW AUTOMOTIVE U.S. LLC,
            Defendant.
_____/

**OPINION AND ORDER**

At a session of said Court, held in the U.S.
District Courthouse, Eastern District
of Michigan, on October 24, 2007.

PRESENT:    THE HONORABLE PATRICK J. DUGGAN
                    U.S. DISTRICT COURT JUDGE

Plaintiffs initiated this lawsuit after their former employer, Defendant TRW Automotive U.S. LLC ("TRW"), closed the manufacturing and assembly plant where they worked on Van Dyke Road in Sterling Heights, Michigan ("Van Dyke Plant"). Plaintiffs allege that TRW closed the Van Dyke Plant to prevent employees from obtaining pension and retiree health care benefits, in violation of Section 510 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1140. On March 31, 2007, the Court certified this matter as a class action.[1] Now before the Court is TRW's motion for

---

[1]The Class is defined as follows:

summary judgment. The motion has been fully briefed and, on October 11, 2007, this Court held a motion hearing. For the reasons set forth below, the Court grants TRW's motion.

**I.      Standard for Summary Judgment**

Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512 (1986). After adequate time for discovery and upon motion, Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

The movant has the initial burden of showing "the absence of a genuine issue of material fact." *Id.* at 323. Once the movant meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *See Matsushita*

---

> Employees who did not accrue 360 pension credits at the time the [Van Dyke Plant] ceased active production, and, on or before that date, were on the layoff or active rolls of the [Van Dyke Plant] and were not permitted to transfer to the Mancini plant or retired prematurely because they were informed that they would not be permitted to transfer to the Mancini plant.

*See* 3/21/07 Op. and Order Granting Plaintiffs' Mot. for Class Cert.

*Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986). To demonstrate a genuine issue, the non-movant must present sufficient evidence upon which a jury could reasonably find for the non-movant; a "scintilla of evidence" is insufficient. *See Liberty Lobby*, 477 U.S. at 252, 106 S. Ct. at 2512.

The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See id.* at 255. The inquiry is whether the evidence presented is such that a jury applying the relevant evidentiary standard could "reasonably find for either the plaintiff or the defendant." *See id.*

## II. Factual Background

TRW, an indirect subsidiary of TRW Automotive Holdings Corporation ("TRW Holdings"), operated the Van Dyke Plant. At this 370,000 square foot facility, which was part of TRW's North American Braking and Suspension group, employees manufactured front suspension components for automobile manufacturers. Specifically, the Van Dyke Plant produced ball joints, steering linkages, tie rods, and related components. Once produced, the components were shipped to automobile manufacturers for assembly into a front end suspension, which ultimately would be assembled into an automobile or truck.

Employees at the Van Dyke Plant were represented by the United Automobile Workers of America ("UAW"). TRW and the UAW were parties to a collective bargaining agreement that covered the terms and conditions of employment of bargaining unit employees at the Van Dyke Plant. TRW and the UAW also negotiated a defined pension plan for the benefit of Van Dyke Plant employees. Pursuant to the pension plan,

employees who retired from active service with 30 or more years of "benefit service" were entitled to retirement benefits, as defined by the plan. Benefit service generally was earned for each year in which the employee worked 1680 hours; however if an employee was laid off during a given calendar year, the employee had to work 170 hours to acquire pension credits for the year. Employees who retired from active service on or after age 55, with 10 or more years of benefit service, were entitled to an early retirement benefit. Under the terms of the collective bargaining agreement and pension plan, benefit service only was earned for work performed at the Van Dyke Plant.

TRW claims that by 2004, it faced significant overcapacity within its North American Braking and Suspension group (hereafter "Suspension group"), which included the Van Dyke Plant. Therefore, in approximately September 2004, the Suspension group formulated a restructuring plan to reduce the number of its North American manufacturing facilities. As part of this plan, TRW analyzed the costs and benefits of shutting down several facilities in North America. In August 2005, TRW announced that it would close the Van Dyke Plant by July 2006, and transfer all assembly work to a plant in Canada.

Before TRW decided to close the Van Dyke Plant, it considered placing certain suspension module work for DaimlerChrysler there. DaimlerChrysler presented this module work to TRW in late 2003. At that time, DaimlerChrysler contacted TRW's DaimlerChrysler North American Suspension System sales account manager, Howard Puuri, and asked him if TRW would bid on module assembly work for four North American DaimlerChrysler plants.

The module work did not require any manufacturing. Instead, TRW would receive component parts from other manufacturers selected by DaimlerChrysler, assemble the parts into various modules (e.g. front suspension modules such as power steering components and brake components and rear suspension modules such as brake components), sequence the modules for ready assembly into vehicles, and transport the modules to the DaimlerChrysler assembly plant. The facility producing the module parts needed at least ten shipping bays adjacent to the assembly line and had to be within close proximity to the DaimlerChrysler site where the parts would be fed into an automotive assembly line.[2] One of the DaimlerChrysler plants to be supplied with the module parts was located in Sterling Heights, Michigan. Therefore, DaimlerChrysler initially asked TRW to prepare its bid using the existing Van Dyke Plant as the location for the module work. Bruce Hoover, TRW's Director of Operations and General Manager for the Linkage and Suspension product line, ultimately determined that the Van Dyke Plant was not a suitable location for the module work. (Pls.' Resp., Ex. 28 at 35.)

DaimlerChrysler eventually awarded the module work to TRW. Kelsey-Hayes Company, another subsidiary of TRW Holdings, thereafter leased a 70,000 square foot facility on Mancini Drive in Sterling Heights, Michigan, a short distance from the Van Dyke Plant. In August 2006, Kelsey-Hayes began regular production of the modular

---

[2]Close proximity to DaimlerChrysler's assembly line and increased traffic in and out of the module work facility were necessary because, after assembly, the component parts needed to arrive at the vehicle assembly line within 60 to 90 minutes. (Pl.'s Resp., Ex. 37 at 46.)

assemblies for DaimlerChrysler at the Mancini Drive facility.[3] Kelsey-Hayes employs regular, full-time employees at the Mancini Drive plant. Those employees are not represented by a union and they do not have a defined-benefit pension plan.

In July 2006, before the Van Dyke Plant closed, the UAW and TRW entered into plant closing negotiations. During these negotiations, the UAW and TRW discussed preferential hiring at the Mancini Drive facility for Van Dyke Plant employees and "bridging" employees at the Van Dyke Plant who were close in benefit service years to reach retirement eligibility. TRW also proposed to pay individuals a severance benefit of $100,000 if they opted out of their available retiree health benefits. The UAW and TRW ultimately were not able to reach a plant closing agreement.

The Van Dyke Plant eventually closed its doors on January 26, 2007. At the time, three employees missed a 30-year retirement by less than one year of benefit service (Plaintiffs Jerry Crawford, Don Hoskins, and Larry Powell). All three employees had been involuntarily laid off in 2005. Four additional employees missed a 30-year retirement benefit by fewer than two years of benefit service.

Plaintiffs initiated this lawsuit on September 28, 2006. In their complaint, Plaintiffs allege that TRW violated Section 510 of ERISA by (1) failing to recall employees to work following a layoff in order to prevent the employees from attaining retirement eligibility, and (2) closing the Van Dyke Plant and refusing to transfer employees to the Mancini

---

[3]While the Court assumes that TRW subcontracted the module work to Kelsey-Hayes, the parties actually have not explained how Kelsey-Hayes acquired the work.

Drive facility for the purpose of preventing employees from attaining retirement eligibility.

## III. Applicable Law and Analysis

Section 510 of ERISA provides in relevant part:

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan . . . or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan, . . .

29 U.S.C. § 1140. The Sixth Circuit has noted that this Section "was designed to prevent 'unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested pension rights.'" *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1113 (6th Cir. 2001) (quoting *West v. Butler*, 621 F.2d 240, 245 (6th Cir. 1980)). In order to prevail on a Section 510 claim, the plaintiff must show that the defendant had the specific intent to violate ERISA. *Humphreys v. Bellaire Corp.*, 966 F.2d 1037, 1043 (6th Cir. 1992). "The plaintiff is not required to show that the employer's sole purpose in discharging him was to interfere with his pension benefits, but rather that it was 'a motivating factor' in the decision." *Id.* (citations omitted).

To evaluate a Section 510 claim, the Sixth Circuit, like many courts, applies the burden-shifting framework the Supreme Court set forth in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089 (1981). *Humphreys*, 966 F.2d at 1043. First, the plaintiff must establish a *prima facie* case by presenting evidence

of "'(1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment of any [ERISA] right to which the employee may become entitled.'" *Id.* (quoting *Gavalik v. Cont'l Can Co.*, 812 F.2d 834, 853 (3d. Cir. 1987)). If the plaintiff sets forth such a *prima facie* case, "it is the employer's burden to 'introduce admissible evidence of a legitimate, nondiscriminatory reason for its challenged action.'" *Id.* If the employer carries its burden, "the plaintiff must either prove that the interference with [the plaintiff's ERISA rights] was a motivating factor in the employer's actions or prove that the employer's proffered reason is unworthy of credence." *Id.*

TRW raises five general arguments in support of its motion for summary judgment. First, TRW argues that Plaintiffs cannot establish a *prima facie* case under Section 510. With respect to TRW's closure of the Van Dyke Plant, TRW contends that Plaintiffs cannot establish that it closed the plant with the specific intent to interfere with employees' attainment of ERISA benefits. With respect to Plaintiffs' claim that TRW failed to transfer employees to the Mancini Drive facility in order to prevent them from attaining benefits, TRW argues that Plaintiffs' claim is not actionable under Section 510. TRW also argues that its decision to close the Van Dyke Plant is not actionable under Section 510. Next, TRW maintains that, even if Plaintiffs establish a prima facie case under Section 510, they cannot produce evidence to demonstrate that TRW's legitimate reason(s) for its actions was a pretext for discrimination. Lastly, TRW contends that, even if Plaintiffs demonstrate a Section 510 violation, there are no remedies available to them under ERISA.

8

### A. Whether TRW's decision to close the Van Dyke Plant is actionable under Section 510

Relying on several cases, primarily *Coomer v. Bethesda Hospital, Inc.*, 370 F.3d 499, 508 (6th Cir. 2004), TRW argues that corporate plant closing decisions that affect ERISA plans are not actionable under Section 510. (TRW's Br. in Supp. of Mot. at 15-16.) In support of its assertion, TRW quotes the Sixth Circuit's statement in that case that "[n]othing in ERISA requires employers to establish employee benefit plans. Nor does ERISA mandate what kind of benefits employers must provide if they choose to have such a plan." (*Id*. at 15 (quoting *Coomer*, 370 F.3d at 508).) TRW further relies on the *Coomer* court's pronouncement that "'[e]mployers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare [or pension benefit] plans.'" 370 F.3d at 508 (quoting *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78, 115 S. Ct. 1223 (1995)).

*Coomer*, however, does not guide the Court's decision in this case because it did not involve a plant closure or similar employer conduct. *Coomer* involved a plan administrator's decision to amend the terms of an employee pension plan to allow for a lump sum distribution of pension benefits to one employee and its subsequent denial of other employees' requests for an amendment to allow a lump sum distribution to them. As the *Coomer* plaintiffs did not allege or show that the plan administrator's alleged discrimination was designed to retaliate against employees for their exercise of a right under the plan or to interfere with employees' attainment of pension benefits to which they

9

were entitled under the plan, the court found no Section 510 violation. *Id*. at 509. The court simply held that unequal treatment in the design of a plan does not give rise to a cause of action under Section 510. *Id*.

Two of the other cases on which TRW principally relies involved plant closures: *Adcox v. Teledyne, Inc.*, 31 F.3d 1381 (6th Cir. 1994) and *Andes v. Ford Motor Co.*, 70 F.3d 1332 (D.C. Cir. 1995). Neither case, however, supports TRW's argument that an employer's decision to close a plant can never give rise to a Section 510 claim, as the courts' rejection of the plaintiffs' claims in both cases was premised instead on the absence of evidence of an intent by the defendants to interfere with the employees' ERISA rights. In fact the D.C. Circuit specifically stated in *Andes* that, under certain circumstances, Section 510 could be implicated by a company's basic organizational decision (e.g. shutting down a particular plan or division). 70 F.3d at 1338 (explaining that a company's decision to shutdown a subdivision where most employees soon to be eligible for a rich benefits package worked may "merely mask[] a determination to interfere with the employees' attainment of benefit plan rights"); *see also Gavalik v. Cont'l Can Co.*, 812 F.2d 834 (1987) (finding a Section 510 violation where the employer decided to close down an entire production line causing a loss of employment where the decision was part of a "liability avoidance" plan to "avoid triggering future vesting" of employees' pension benefits).

The Court concludes that an employer's decision to close a plant, although not always actionable under Section 510, is actionable if a motivating factor for the

10

employer's decision is its desire to interfere with employees' attainment of ERISA benefits.

### B. Whether TRW's failure to recall Plaintiffs from lay-off and its refusal to transfer Van Dyke Plant employees to the Mancini Drive facility are actionable under Section 510

In support of their Section 510 claim, Plaintiffs also allege that TRW "failed to recall [] Plaintiffs to work following a layoff for the specific purpose of preventing them from establishing eligibility for their 30 year service pension and obtaining their company paid for medical and health insurance." (Compl. ¶ 62.) Plaintiffs further allege a Section 510 violation based on TRW's failure to transfer employees from the Van Dyke Plant to the Mancini Drive facility. TRW maintains that neither forms of conduct are actionable under Section 510. The Court agrees.

Section 510 prohibits an employer from "discharg[ing], fin[ing], suspend[ing], expel[ling], disciplin[ing], or discriminat[ing] against a participant or beneficiary . . . for the purpose of interfering with the attainment of [ERISA benefits]." 29 U.S.C. § 1140. According to its plain language, the statute does not apply to an employer's decision whether to *recall* employees from layoff or whether to *transfer* employees to a different facility. Plaintiffs fail to present any case where the statute was applied to such employment decisions.

To the extent Plaintiffs contend that TRW "discriminate[d]" against employees in deciding who to recall from layoff, Plaintiffs present no evidence to suggest that TRW considered employees' eligibility for ERISA benefits when selecting who to recall. The

11

evidence instead shows that TRW recalled employees based on their seniority and that, because they were recalled, at least two employees accrued sufficient pension credits to retire. (Def.'s Mot., Ex. 12 at 157; Ex. 26). Further, with respect to Plaintiffs' claim that TRW should have transferred Van Dyke Plant employees to the Mancini Drive facility, the collective bargaining agreement between TRW and the UAW provided that employees accrued benefit service hours for work performed only at the Van Dyke Plant. "ERISA § 510 affords protection from discrimination that interferes 'with the attainment of any right to which such participant may become entitled *under the plan*." *McGath v. Auto-Body North Shore, Inc.*, 7 F.3d 665, 670 (7th Cir. 1993) (emphasis added) (quoting 29 U.S.C. § 1140). An employee "does not have a *right* to treatment that is contrary to the terms of the plan, . . ." *Id.* (emphasis in original).

Plaintiffs argue that the Mancini Drive facility is simply an alter ego operation of the Van Dyke Plant, which TRW opened to avoid its ERISA obligations. To be considered an alter ego operation, the Mancini Drive facility must be a "disguised continuance" of the Van Dyke Plant. *Yolton v. El Paso Tennessee Pipeline Co.*, 435 F.3d 511, 586-87 (6th Cir. 2006) (citation omitted). Stated differently, the Mancini Drive facility must represent "'a mere technical change in the structure or identity of the [Van Dyke Plant] . . . without any substantial change in its ownership or management.'" *Id.* at 586 (quoting *Howard Johnson Co. v. Detroit Local Joint Executive Bd.*, 417 U.S. 249, 259 n.5, 94 S. Ct. 2236 (1974)). For the reasons set forth in TRW's reply brief, however, the Court finds that the alter ego doctrine has no application in this case. (*See* Defs.' Reply

Br. at 4-6.)

## C. Whether Plaintiffs establish a prima facie case under Section 510

To support their prima face case under Section 510, Plaintiffs contend that TRW closed the Van Dyke Plant– as well as other unionized plants where collective bargaining agreements entitled employees to retiree benefits– in order to prevent employees from attaining ERISA benefits. Plaintiffs contend that the closure of these facilities was part of a scheme that TRW devised to reduce its legacy costs. Plaintiffs also argue that, as part of this benefits avoidance scheme, TRW refused to bridge benefits for older employees close to attaining retirement benefits during its plant closing negotiations with the union.

In support of their prima facie case, Plaintiffs present company documents in which TRW recognizes the need to reduce its legacy costs. (*See, e.g.,* Pls.' Resp., Ex. 2.) In one company document, TRW identifies the following as part of its restructuring plan: "Reduce heritage costs . . . by bringing in new employees with modified compensation packages." (*Id*. at 05084.) Plaintiffs also present company documents reflecting that, in deciding whether to close the Van Dyke Plant, TRW specifically identified by name and benefit savings those employees who would be ineligible for ERISA benefits if the plant closed. (Pls.' Resp., Ex. 5.) Plaintiffs also rely on the deposition testimony of Ron Muckley, the Vice President of Operations for the Suspension Group, in which Mr. Muckley indicates that pension costs was one of the reasons that TRW selected the Van Dyke Plant for closure. (Pls.' Resp., Ex. 28 at 152-53.) Finally, Plaintiffs point out that TRW transferred the work of the Van Dyke Plant to a non-union facility where legacy or

13

heritage costs were reduced or were non-existent.

The Sixth Circuit has stated that "[a] plaintiff's burden in establishing a prima facie case is not intended to be an onerous one." *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1114 (2001). With that guideline in mind, this Court concludes that Plaintiffs present sufficient evidence to demonstrate a *prima facie* case under Section 510. A trier of fact could reasonably infer from Plaintiffs' evidence that TRW closed the Van Dyke Plant to interfere with employees' attainment of retirement benefits.

### D. Whether TRW demonstrates a legitimate, nondiscriminatory reason for its conduct

The Court now must determine whether TRW has met its burden of showing that it had a legitimate, nondiscriminatory reason for closing the Van Dyke Plant. The Court finds that TRW has satisfied its burden.

TRW contends that it made the decision to close the Van Dyke Plant due to the plant's overcapacity. TRW maintains that the Van Dyke Plant– like other facilities in its Suspension group– was underutilized by 2004, resulting in prohibitive overhead costs. TRW explained the cause of this underutilization in one company document: "TRW 'has not been able to secure new business for future growth for the Suspension Group' due to its '[c]ore [c]ustomers: Ford and DCX hav[ing] los[t] significant market share and . . . having financial ills' and because '[t]ransnational OEM's have gained market share and do not have the legacy costs of the big three competitive products to market[.]'" (Defs.' Mot., Ex. 9.) This document further reports that only 30,000 square feet of the Van Dyke

14

Plant's over 300,000 square feet of production capacity was being utilized, resulting in fixed costs accounting for 26% of every sales dollar. (*Id.*) According to TRW, acceptable fixed costs are between 10-15%. (*Id.*) TRW explains that in response to the decrease in business for the Suspension group, it devised a plan to shut down several facilities in North America, including the Van Dyke Plant. Although acknowledging that it considered legacy costs in selecting the Van Dyke Plant and other North American facilities for shutdown, TRW maintains that these costs were only "one reason among several." (Pls.' Resp., Ex. 28 at 152-53.)

While Plaintiffs argue that TRW has never been under severe financial stress and that the Van Dyke Plant was profitable and had sales in the billions of dollars for several years before it closed, *see infra*, Plaintiffs do not dispute that the plant was underutilized by 2004. In fact Plaintiffs specifically acknowledge the financial troubles that plagued the Van Dyke Plant in their response brief: "Indeed, the sales generated at the Van Dyke Plant, by the [F]all of 2004, did not support the fixed costs required to operate the business." (Pls.' Resp. Br. at 7.) Moreover, Plaintiffs' own figures reflect that the Van Dyke Plant experienced declining sales of nearly 30% between 2003 and 2005. (*Id.* at 3.) The decision with which Plaintiffs really quarrel is TRW's decision to not place the DaimlerChrysler module work at the Van Dyke Plant, which they claim would have brought the plant to full capacity and revitalized its sales.

TRW provides evidence, however, to demonstrate that its decision to place the module work at a new facility, instead of at the Van Dyke Plant, was based on its business

15

judgment and not on a desire to interfere with Plaintiffs' ERISA benefits. Bruce Hoover, Director of Operations and General Manager for TRW's Linkage and Suspension product line, made the ultimate decision to place the module work at a new facility. During his deposition in this case, Mr. Hoover identified several reasons why he reached this decision. (Defs.' Mot., Ex. 11 at 39-55.)

First, Mr. Hoover explained that the module work was a different business than the work performed at the Van Dyke Plant. (*Id*. at 39-41.) As Mr. Hoover elaborated, whereas employees at the Van Dyke Plant primarily were involved in manufacturing component parts which may have involved the assembly of those parts, the module work required no manufacturing and the assembly of entire systems. (*Id*.) Second, Mr. Hoover explained that the Van Dyke facility was too big for the module work. (*Id*. at 42.) Only 70,000 square feet was needed for the module work. (*Id*.) Although existing work at the Van Dyke Plant used 35,000-50,000 square feet, the combined work still did not utilize the plant's total floor space of 300,000-370,000 square feet. Mr. Hoover's third reason for rejecting the Van Dyke Plant for the module work was his belief that the plant did not have a sufficient number of shipping docks or roads leading into and out of the facility. (*Id*. at 43-44.) Mr. Hoover determined that changing the infrastructure to add shipping docks and roads to handle increased traffic would require substantial capital investment. (*Id*. at 43-44.) Finally, Mr. Hoover explained that TRW wanted to lease a facility for the module work so that it could walk away from the business after the five year contract for the work expired. (*Id.* at 44-45.)

Based on the above, the Court finds that TRW establishes legitimate, nondiscriminatory reasons for its decision to not place the DaimlerChrysler module work at the Van Dyke Plant and to ultimately close the Van Dyke Plant. As TRW demonstrates, its closure of the Van Dyke Plant was part of an overall effort to consolidate its Northern American facilities in the Suspension group. This effort was devised by TRW in response to decreased work for those facilities and the facilities' inability to compete as a result of uncompetitive wage structures. While the cost of ERISA benefits was one factor that rendered the wage structures within certain facilities uncompetitive, those were not the only costs. For example, the hourly wages among the facilities were significantly different. (*See, e.g.,* Pls.' Resp., Ex. 28 at 95-96.) "'Measures designed to reduce costs in general that also result in an incidental reduction in benefit expenses do not suggest discriminatory intent.'" *Daughtrey v. Honeywell, Inc.*, 3 F.3d 1488, 1492 (11th Cir. 1993) (quoting *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1224 (11th Cir. 1993)).

### E. Whether Plaintiffs demonstrate that TRW's reasons were pretextual

As TRW sets forth legitimate, nondiscriminatory reasons for its decision to close the Van Dyke Plant and place the module work at a different facility, Plaintiffs must present evidence to show that TRW's decision was more likely motivated by the desire to interfere with their ERISA benefits or that TRW's proffered explanation is unworthy of credence. *Gavalik*, 812 F.2d at 853. Plaintiffs argue that "[t]he record is full of documents indicating [TRW's] desire to reduce legacy costs" and that "[e]ligiblity for pension and retiree health benefits was a factor in [TRW's] decision-making regarding

17

plant closings." (Pls.' Resp. Br. at 29-30.)

As indicated earlier, however, to demonstrate a violation of Section 510, it is not sufficient for the plaintiff to show that the reduction of retiree costs was *a* factor in the employer's decision. The plaintiff must show that avoiding those costs was "a *motivating* factor." *Humphreys*, 966 F.3d at 1043. At most, Plaintiffs' proofs demonstrate that TRW considered legacy costs as one, among several, factors in deciding to reduce the number of facilities in its North American Suspension group and in selecting which facilities to close.

Plaintiffs also assert, however, that they can demonstrate that TRW's asserted reason for closing the Van Dyke Plant– i.e. overcapacity– is unworthy of credence. As set forth previously, however, Plaintiffs acknowledge that TRW's Suspension group in general and its Van Dyke Plant in particular were faced with significant overcapacity by 2004, and that the latter's sales had decreased from $72 million in 2003 to $47 million in 2005. (*See* Pls.' Resp. Br. at 3.) Plaintiffs claim of pretext relates to TRW's stated reasons for not placing the DaimlerChrysler module work at the Van Dyke Plant in order to resolve the plant's overcapacity problem and revitalize its sales. According to Plaintiffs, TRW's stated reasons are not worthy of credence. However Plaintiffs fail to establish that TRW's stated reasons are not credible; instead, they only show that they disagree with TRW's business judgment.[4] "The soundness of an employer's business

---

[4] For example, to counter TRW's claim that there was insufficient ingress and egress at the Van Dyke Plant to accommodate the module work, Plaintiffs note a

judgment . . . may not be questioned as a means of showing pretext." *Brocklehurst v. PPG Indus., Inc.*, 123 F.3d 898 (6th Cir. 1997) (internal quotation marks and citations omitted).

IV.     **Conclusion**

TRW's refusal to recall certain employees from layoff and to transfer Plaintiffs to the Mancini Drive facility do not fall within the statute's prohibited conduct.  While a company's decision to close a facility may implicate Section 510, the plaintiff must show that the company's selection of the facility was motivated by a desire to interfere with the workers' ERISA benefits.  In the present case, Plaintiffs fail to raise a genuine issue of material fact with regard to whether such a desire was a determinative or motivating factor in TRW's decision.

Accordingly,

**IT IS ORDERED**, that TRW's motion for summary judgment is **GRANTED**.

s/PATRICK J. DUGGAN
UNITED STATES DISTRICT JUDGE

Copies to:
Megan A. Bonanni, Esq.
Jeanne E. Mirer, Esq.
Michael L. Pitt, Esq.
Robert W. Palmer, Esq.
Robert M. Vercruysse, Esq.
William E. Altman, Esq.

---

discrepancy in the testimony regarding the existing number of loading docks at the plant.  One witness testified that there were two loading docks, requiring the building of eleven more; whereas Plaintiffs claim that there were seven existing loading docks.  Plaintiffs acknowledge that, even accepting their number, at least a few loading bays would need to be added; but they argue that TRW "does not state how much adding a few more loading bays would cost" and "it is difficult to imagine that it would have been more than the initial $2 million in capital costs to retool various machines in preparation for moving or the cost of a new building."  (Pls.' Resp. Br. at 31.)  The Court believes that the decision as to how to invest $2 million, is a decision left to TRW.